Prepared by:
Donald F. Campbell, Jr., Esq. (DC8924)
**GIORDANO, HALLERAN & CIESLA, P.C.**
125 Half Mile Road, Suite 300
Red Bank, NJ 07701
(732) 741-3900
Counsel for Plaintiffs

| | |
|---|---|
| In re<br><br>WILLIAM J. FOCAZIO,<br><br>Debtor. | **UNITED STATES BANKRUPTCY COURT DISTRICT COURT OF NEW JERSEY, NEWARK VICINAGE**<br><br>Chapter 11<br><br>Case No.   19-10880 (VFP) |
| ALLSTATE NEW JERSEY INSURANCE COMPANY, ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY, ALLSTATE NEW JERSEY PROPERTY AND CASUALTY INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ENCOMPASS INSURANCE COMPANY OF NEW JERSEY, ENCOMPASS INDEMNITY COMPANY, ENCOMPASS PROPERTY AND CASUALTY COMPANY OF NEW JERSEY,<br><br>          Plaintiffs,<br>v.<br><br>WILLIAM J. FOCAZIO,<br><br>          Defendant. | Adv. No.<br><br>Judge: Hon. Vincent F. Papalia, U.S.B.J. |

**ADVERSARY COMPLAINT TO OBJECT TO DISCHARGE PURSUANT TO 11 U.S.C. §§523, 727 AND FED. R. BANKR. P. 4004 AND 4007**

Allstate New Jersey Insurance Company; Allstate Insurance Company; Allstate

Indemnity Company; Allstate Property and Casualty Insurance Company; Allstate New Jersey

Property and Casualty Insurance Company All State Fire and Casualty Insurance Company,

1

Encompass Insurance Company of New Jersey, Encompass Indemnity Company, Encompass

Property and Casualty Company of New Jersey (collectively, "Allstate"); and Encompass

Insurance f/k/a Continental Insurance Company of New Jersey and Commercial Insurance

Company of Newark, NJ ("Encompass," and collectively with Allstate, the "Plaintiffs"), by and

through their counsel, Giordano Halleran & Ciesla, and by way of Complaint against William J.

Focazio (the "Debtor"), hereby allege as follows:

## JURISDICTION AND VENUE

1.       On January 15, 2019, the Debtor filed for bankruptcy protection under Chapter

11 of the United States Bankruptcy Code (the "Code") under case number 19-10880(VFP).

2.       This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 157 and 1334.

3.       This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J).

4.       Venue is properly fixed in this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

5.       This adversary proceeding is brought pursuant to 11 U.S.C. §§ 105(a), 523(c)(1),

727(a), and Fed. R. Bankr. P. 7001(6) to determine the dischargeability of a debt.

## THE PARTIES

6.       Plaintiffs at times relevant hereto were authorized to issue policies of automobile

insurance in New Jersey and New York and conduct business throughout the State of New

Jersey and New York.

7.       Plaintiffs are insurance companies as defined by the New Jersey Insurance Fraud

Prevention Act, N.J.S.A. 17:33A-1 *et seq*. (the "Fraud Act").

8.       Debtor currently resides at 101 Fox Hedge Road, Saddle River, New Jersey

07458.

9.      Debtor is a licensed physician in good standing in New York and New Jersey.

10.     Endosurgical Center of North Jersey, P.C. (hereinafter, "Endo"), is a New Jersey

professional corporation that is a New Jersey licensed ambulatory surgery center that is wholly

owned by the Debtor.

11.     William J. Focazio, M.D., P.A., is New Jersey professional association and is a

medical practice wholly owned by the Debtor.

12.     Metropolitan Anesthesia, LLC, (hereinafter, "Metropolitan"), is a New Jersey

limited liability company and is a medical practice that is wholly owned by the Debtor.

13.     Crosstown Medical P.C., (hereinafter, "Crosstown Medical"), was formed as a

New York corporation on February 15, 2018 and is wholly owned by the Debtor.

14.     The New Jersey entities owned or controlled by the Debtor are hereinafter

collectively referred to as the "New Jersey Entities."

15.     As discussed in detail below, in or about 2012, Plaintiffs became aware of and

investigated fraudulent activities engaged in by the Debtor and the New Jersey entities relative

to Personal Injury Protection (hereinafter, "PIP") medical services rendered to Allstate's

claimants.

16.     Debtor and the New Jersey Entities are each a "person" as defined by the Fraud

Act.  Upon information and belief, the Debtor has an extensive history of making fraudulent

claims under the New Jersey No-Fault Law, N.J.S.A. 39:6A-1 (the "No-Fault Law").  He was

involved in various schemes to defraud automobile insurers, and he was the director of and/or

participated in the schemes described herein to defraud Plaintiffs.

17.     Prior to Allstate filing suit against the Debtor and the New Jersey entities, the

Debtor sought out, negotiated and entered into a settlement agreement, as discussed further

below, that resolved pending claims for PIP medical benefit payments sought by the New Jersey Entities from Allstate.

18.      The Debtor and the New Jersey entities did not comply with the terms of the settlement agreement as set forth below.

19.      Starting 2018, Debtor also submitted claims for New York No Fault automobile medical benefits to Plaintiffs for the alleged provision of medical services under the name of Crosstown Medical, P.C., (hereinafter "Crosstown Medical").

20.      Allstate, in good faith, made payments to Crosstown Medical without knowing that Debtor and Crosstown Medical were engaged in fraudulent schemes which rendered the services billed by Crosstown Medical and Debtor non-compensable under both New York and New Jersey law.

## **BACKGROUND**

*The Allstate Plaintiffs' Settlement Agreement with Debtor William J. Focazio, M.D.; Endosurgical Center of North Jersey, P.C. and Metropolitan Anesthesia, LLC*

*Background of Allstate's Investigation of Debtor, Endo and Metropolitan Anesthesia*

21.      In or about early 2010, the Special Investigation Unit of the Allstate New Jersey Insurance Company began investigating Christopher Montana, D.C. and Fernando Barrese, D.C., and a group of chiropractic clinics they owned (collectively referred to herein as the "Montana/Barrese Chiropractic Clinics").   Allstate suspected that Montana and Barrese, in concert with personal injury attorneys, were paying runners for patients who had been involved in automobile accidents, and were in turn receiving kickbacks directly and/or through intermediaries, known as "Patient Brokers," from the specialty providers and ancillary healthcare facilities to whom they were referring those patients.

4

22.    On July 27, 2011, following a separate investigation undertaken by agents of the Federal Bureau of Investigation ("FBI") and the New Jersey Office of Insurance Fraud Prosecutor ("OIFP"), which included conversations of Montana surreptitiously recorded by personal injury attorney "V.H." while acting as a Confidential Witness (the "CW"), Montana and Barrese were arrested and charged with, *inter alia*, violations of New Jersey's anti-running statute.    On November 28, 2012, Montana and Barrese both pleaded guilty in the Superior Court to criminal accusations charging them with two counts of third-degree use of runners and third-degree filing of false and fraudulent tax returns.   They were each subsequently sentenced to 7 years in state prison.

23.    During the course of Allstate's investigation, an analysis of patient billing and treatment data compiled by Allstate from invoices and records submitted by the Montana/Barrese Chiropractic Clinics revealed that beginning in September of 2006, a number of Allstate Personal Injury Protection ("PIP") Claimants ("Allstate Claimants") who were patients of the Montana/Barrese Chiropractic Clinics, as well as those of other chiropractors, were being referred for manipulations under anesthesia ("MUAs") and/or pain management procedures to Endosurgical Center of North Jersey, P.C. ("Endo").  Neither Focazio nor Endo had previously treated a significant number of PIP patients.  During those procedures, these claimants all received anesthesia.  Initially, anesthesia services were rendered at Endo through third-party anesthesia providers.   However, beginning in mid-May 2008, the anesthesia services were billed in the name of Metropolitan Anesthesia, LLC, which the Debtor had formed on April 14, 2008, for the obvious purpose of profiting from the anesthesia services rendered to these patients.

24.    As set forth at greater length below, Allstate also discovered during the course of

5

that investigation that on October 20, 2011, Michael Angelo ("Angelo"), had filed suit against Debtor and his medical practices, William J. Focazio, M.D., P.A. and Metropolitan Anesthesia, LLC, and his licensed ambulatory surgery center ("ASC") EndoSurgical Center of North Jersey, P.C. ("Endo")(collectively referred to herein as the "Focazio Group") in the New Jersey Superior Court in Bergen County, No. L-8733-11 (the *Bergen County Litigation*").    Angelo was already known to Allstate's Special Investigation Unit as a "Patient Broker," which is a person who unlawfully takes kickbacks from healthcare providers and facilities in exchange for causing personal injury attorneys and the chiropractors and other primary providers who treat their clients, to refer their clients/patients to those healthcare providers and facilities. In a Verified Complaint and accompanying Certification he filed in that suit, Angelo admitted that he and his "networking and marketing" entity, Pacific Marketing, received more than $9 Million from the Focazio Group over a nearly 5-year period, in exchange for causing patients to be referred to Endo for procedures.    Angelo even attached to his Verified Complaint in the *Bergen County Litigation* a copy of an Exclusive Marketing Agreement they had entered into in April of 2007 (the "April 2007 Exclusive Marketing Agreement" or "Agreement").    This Agreement expressly required that the Focazio Group pay to Angelo and Pacific Marketing "50% of the net profits" earned by Endo on all patients who underwent procedures at Endo as the result of the marketing efforts of Angelo and Pacific Marketing.    In his responsive documents, Focazio did not meaningfully dispute Angelo's characterization of their business relationship, except to state that the amount he paid to Angelo and Pacific Marketing over that 5-year period was in excess of $11 Million, and that not all of the PIP patients who underwent procedures at Endo were referred because of Angelo's efforts.

25.        It was readily apparent from the enormous and volume-based compensation that

the Focazio Group agreed to pay to Angelo and Pacific Marketing, and the absence of any terms
in the Agreement that defined the kind of "marketing" services that Angelo and Pacific
Marketing would provide, that the April 2007 Exclusive Marketing Agreement was nothing
more than a thinly disguised cover for a patently unlawful fee-splitting kickback scheme.  Based
on the Marketing Agreement, Angelo's history of using 1-800-USLawyer and other toll-free
numbers and web domains to recruit No Fault patients on behalf of personal injury attorneys,
Angelo's long-term relationship with Montana and Barrese and related entities, and Allstate's
analysis of the referral patterns of the Allstate Claimants who underwent procedures at  Endo
during the period, that the Focazio Group was helping to fund an unlawful referral network
scheme that Angelo was operating with a network of personal injury attorneys and providers.

26.       Allstate began taking steps to file suit against Angelo, Pacific Marketing, the
Focazio Group and others, and ceased making voluntary payments of any bills submitted by
Endo or Metropolitan Anesthesia on June 12, 2012, effective as to dates of service beginning
March 1, 2012.  The Examination of Benefits ("EOB") forms sent to Allstate PIP Claimants
whose bills from Endo and Metropolitan Anesthesia were not paid, thereafter contained notices
that their claims were "under investigation."

*The Settlement of Allstate's Claims Against Debtor, Endo and Metropolitan Anesthesia*

27.       Several months after Allstate ceased making payments on bills from Endo,
counsel for the Focazio Group contacted counsel for Allstate in an effort to learn more about
Allstate's investigation as referenced in the EOBs and to reach a resolution of Allstate's claims
against the Focazio Group before Allstate filed suit.  On November 8, 2012, Debtor and his
counsel met with counsel for Allstate and representatives of Allstate's Special Investigation
Unit in an effort to forestall the filing of a suit by Allstate and to Debtor and his entities and to

7

preserve what they described as the "highly regarded reputation" of Debtor, and to avoid any taint on that reputation that might result if Allstate's investigation continued.

28.     This initial meeting led to months of settlement negotiations and meetings, including the entry into a Standstill Agreement in July of 2012, all of which culminated in a settlement agreement that was entered into between Allstate and the Focazio Group on October 31, 2013 (the "Settlement Agreement").

29.     Pursuant to the Settlement Agreement, the Debtor and the other members of the Focazio Group agreed to pay Allstate $2,750,000.00 pursuant to a 5-year schedule that required both monthly payments and a series of periodic lump sum payments.

30.     In addition, the Focazio Group agreed to waive payment by Allstate on outstanding unpaid invoices owned to Endo and Metropolitan Anesthesia up to a value of $500,000, as determined in accordance with a process set forth in the Settlement Agreement.

31.     Consistent with the concern expressed by Debtor's counsel at the time of the November 8, 2012 meeting that Debtor's "highly regarding reputation" not be tainted by Allstate's investigation, Paragraph 8 of the Settlement Agreement required that Allstate agree, *inter alia*, "to immediately cease its investigation related to Dr. Focazio, the Focazio Group and/or any entity related to the Focazio Group with respect to alleged illegal client/patient referral and kickback schemes involving Angelo, except as necessary to pursue its claims against other individuals and entities in the Litigations."

32.     Paragraph 12 of the Settlement Agreement required Allstate to issue revised Explanations of Benefits to all Allstate Claimants and/or their treating physicians who had previously been informed that the claims of the Focazio Group were "under investigation" or "pending investigation," that "This claim has been resolved by agreement with the provider."

33.     Although the Settlement Agreement contained a provision at Paragraph 10 in which the Debtor and the Focazio Group disputed and denied liability, Paragraph 3 included a "Confession of Judgment" clause as follows:

> In the event of a Payment Default on any payment owed pursuant to Paragraph 1(a) above, Allstate shall be entitled to bring, upon proper and timely notice, a summary action in the Superior Court of New Jersey pursuant to R. 4:45 to enforce the terms of this Agreement and enter a judgment in the amount of the full unpaid balance owed plus attorneys' fees relating to the filing and/or obtaining of the judgment, interest and costs, and any additional attorneys' fees and costs Allstate incurs in collecting on the judgment, including post-judgment interest.

34.     The Settlement Agreement required the Focazio Group to provide Allstate on or before December 31, 2013, with a "a recordable security interest in assets owned by the Focazio Group, reasonably acceptable to Allstate with equity equal to or greater than 110% of all amounts then owed to Allstate by the Focazio Group."

*The Focazio Group's Breach of the Settlement Agreement*

35.     The Focazio Group failed to provide Allstate with a recordable security interest in any assets by December 31, 2013, or at any time thereafter.

36.     Moreover, almost immediately, the Focazio Group began either making their monthly payments under the Settlement Agreement late or failed to make them altogether.

37.     In response to repeated representations by representatives of the Focazio Group that they were attempting to catch up with their payment obligations under the Settlement Agreement, Allstate attempted to work cooperatively with the Focazio Group.

38.     For example, Allstate agreed in May of 2015 to treat four months of missed payments as "deferred," in an effort to enable the Focazio Group to catch up on their late payments by October of 2015.

39.     However, by letter dated October 27, 2015, Allstate Insurance Fraud Analyst Benjamin J. Hickey wrote to Debtor to advise that "[a]s of September 30, 2015, which corresponds to twenty-three months into our settlement, your office should have made 24 payments to Allstate totaling $720,000 (the down payment of $30,000 plus 23 monthly payments of $30,000)."    Although Mr. Hickey stated in the letter that to date Allstate had received only "15 payments of $30,000 from you (including the down payment)," in fact, the number of checks that Allstate received and that cleared was only 14 checks for $30,000 each, which totaled $420,000. The Focazio Group's 15th check for $30,000, which Allstate deposited on October 30, 2015, was returned for insufficient funds.  The Focazio Group never made good on that check.

40.     Mr. Hickey's October 27, 2015 letter to the Debtor, in which he advised him that the Focazio Group had missed 9 payments of $30,000 each under the Settlement Agreement, offered the Focazio Group 10 days to cure their default.

41.     In addition to the need to make up these substantial arrears, the Focazio Group was also required to make a lump sum payment under the Settlement Agreement on November 1, 2015 of an additional $280,000.

42.     The Focazio Group made no attempt to cure their default, and were therefore in Payment Default pursuant to Paragraph 1(a)(v) of the Settlement Agreement no later than November 9, 2015.

43.     As a result of their Payment Default, pursuant to Paragraph 2 of the Settlement Agreement, the $2,330,000.00 balanced owed by Focazio Group pursuant to Paragraph 1(a)(i) thereof, became "immediately due and payable, without further notice by Allstate."

44.     Effective November 9, 2015, pursuant to Paragraph 2, this $2,330,000.00 amount

10

began to bear interest at the "Default Interest Rate of eight percent (8%) compounded annually, without notice to the Focazio Group or further action by Allstate."

45.      As of the date of the filing of this Complaint, the total combined amount owed by the Debtor, with accrued interest at the Default Interest Rate, is $3,208,064.26.

*The Participation of Debtor and the Focazio Group in the Michael Angelo Kickback Scheme and Referral Network Scheme*

46.      By the time Allstate entered into the Settlement Agreement and was required to stop investigating the Focazio Group, Allstate had amassed extensive evidence – including from admissions Angelo and Focazio made in the *Bergen County Litigation* and in a suit Debtor filed on November 30, 2012 against Angelo and Pacific Marketing in Passaic County (the "*Passaic County Litigation*") – that, over four and a half years, the Debtor and other members of the Focazio Group had paid more than $11 Million to Angelo and Pacific Marketing to pay for kickbacks and to fund in-kind patient solicitation and referral schemes in exchange for the referrals of Allstate Claimants and other No Fault patients to Endo through what Allstate refers to as the "Angelo Referral Network Scheme."   By engaging in these schemes the Debtor and the Focazio Parties rendered the health care services for which they billed Allstate and other No Fault insurers in violation of the anti-kickback regulations of the Board of Medical Examiners, N.J.A.C. 13:35-6.17(c) and the Board of Chiropractors, N.J.A.C. 13:44E-2.6, as well as New Jersey's Commercial Bribery Statute, N.J.S.A. 2C:21-10.   In addition, because the Debtor effectively made Angelo, who is a non-licensee, a co-owner of Endo and Metropolitan Anesthesia, those entities at all times between at least April of 2007 and October of 2011, billed Allstate in violation of the practice structure regulations of the Board of Medical Examiners, N.J.A.C. 13:35-6.16.

47.      Because PIP insurers in New Jersey have no obligation to pay for services that were rendered in violation of the applicable regulations bearing on the rendition of the service, Allstate had no obligation to make any payments to the Endo or Metropolitan Anesthesia for any PIP medical services they allegedly provided to the Allstate Claimants during that period. By failing to provide Allstate with notice of these violations at the time they submitted invoices during this period, the Focazio group also violated the New Jersey Insurance Fraud Prevention Act, N.J.S.A 17:33A-1, et seq.

*Referral Network Schemes in General*

48.      Referral Network Schemes have been developed and evolved over time in New Jersey and other No Fault states by unscrupulous personal injury attorneys and healthcare providers, as a way to overcome an inherent asymmetry in the No Fault insurance system: Automobile accident victims are far more likely to respond to Solicitation Methods on behalf of personal injury attorneys, who can offer them the opportunity for a financial recovery, than those offered by healthcare providers, who can offer only treatment or testing.

49.      This reality was colorfully described by Christopher Montana, D.C. during one of his proffer sessions with the OIFP following his arrest in July of 2011:

> I've come to find out that if a patient is sitting on the side of the road holding their left hand in their right with it ripped out and I come up and I say well I'm going to save your life and a lawyer comes up and says I'm going to make you 2 million dollars. They're just going to throw their arm in the bush and get in the car with the lawyer every time. Every time without exception. So I was trying to send out stuff under ah us doctors we just want to treat you. You do get a response some, but nothing like an Attorney does. You just don't.

50.      In addition to this inherent advantage in soliciting recent automobile accident victims, personal injury attorneys are also in the best position to educate clients regarding the correlation between the amount and nature of the treatments and procedures they undergo, and

the monetary amount of a recovery they are likely to receive for any bodily injuries they incurred, thereby either tacitly or expressly encouraging them  to undergo ever more extensive, invasive and expensive treatments and procedures.

51.     Personal injury attorneys are also in the best position to direct the automobile injury clients they obtain through these Solicitation Methods to Litigation Funding Companies to provide settlement advances to their clients and/or, in the case of clients with good liability claims but with only $15,000 PIP limits, surgical loans to fund the cost of surgeries or other procedures needed to optimize the value of the client bodily injury claim.  Because annualized interest rates in excess of 30% are typical on such loans, investors in Litigation Funding Companies have a strong incentive to contribute to the cost of the solicitation methods used to generate new automobile injury clients for law firms that will steer their clients to them.

52.     Moreover, the interests of healthcare providers and entities and Litigation Funding Companies are aligned with those of the personal injury attorney.  The dollar amount of settlement advances generally increase with the number and degree of invasiveness of the pain management and surgical procedures the client undergoes, liability issues otherwise being equal, which provides an incentive for the client/patient to undergo such procedures.  Surgical loans make it possible for pain management providers, surgeons, anesthesiologists and ASCs to earn money from procedures that $15,000 PIP policies would not otherwise cover.  Meanwhile, these procedures increase the value of the client/patient's bodily injury claim, and the personal injury attorney's potential fee.

53.     Yet, personal injury attorneys are not in the best position to pay for the solicitation methods needed to obtain new clients because they are unlikely to earn a contingent fee from their representation of automobile personal injury clients until two or more years later,

if at all.   In contrast, under New Jersey's No Fault insurance system, PIP healthcare providers begin to receive fees within a matter of weeks or months of receiving a patient referral. Litigation Funding Companies begin to accrue interest on their litigation loans as soon as they make them.

54.      Nearly all Referral Network Schemes have a mechanism whereby healthcare providers and facilities fund or substantially subsidize the cost of soliciting patients in the names of personal injury attorneys.   In exchange for receiving automobile accident injury clients as a result of these and other provider-funded solicitation methods, the personal injury attorneys participating in the network, are required to refer these clients, and often other clients they obtained independently of the scheme, to primary providers, such as chiropractors or purported MD/DC practices, who are also participating in the referral network scheme, and who will in turn refer the client/patients along a "conveyor belt" of participating specialty health care providers and facilities, such as MRI facilities, EDX testing providers, pain management providers, orthopedic surgeons, ambulatory surgery centers, pharmacies, diagnostic testing labs, etc.

55.      The pattern of referrals of Allstate Claimants and other No Fault Patients by and among participants in a referral network scheme is referred to herein as the "PIP Conveyor Belt."  In exchange for receiving referrals along the PIP Conveyor Belt, providers and facilities participating in referral networks, and particularly those in the higher profit margin specialties, such as pain management providers, orthopedic and other surgeons, ASCs, toxicology labs, etc. make payments directly or indirectly to and through intermediaries commonly known and referred to as "kickback brokers," "patient brokers" or "client/patient brokers" (collectively referred to herein as "Patient Brokers"), either in cash or by check under the guise of paying for

seemingly legitimate expenses, such as marketing, advertising, consulting, transportation, or other seemingly legitimates descriptions, but which funds are in fact used to fund or subsidize the various solicitation methods used to generate No Fault clients on behalf of the participating attorneys and in exchange for which those attorneys refer these and other personal injury clients to, and urge them to undergo treatment, testing and procedures with the participating healthcare providers and facilities along the PIP Conveyor Belt.

56.     By their very nature, Referral Network Schemes require participating personal injury attorneys and healthcare providers to refer their clients/patients to other healthcare providers not on the basis of what is in the best interest of the client/patient, but rather on the basis of what is in the attorneys' and healthcare providers' own self-interest, namely to refer the client/patient to other participating providers in the Referral Network Scheme so that the attorneys and providers will continue to receive new clients/patients from which they can profit through the scheme.

57.     For this reason, participation in Referral Network Schemes by personal injury attorneys and healthcare providers not only violates the anti-kickback regulations of the Board of Medical Examiners and the Board of Chiropractic Examiners, and numerous Rules of Profession Conduct governing the conduct of attorneys, but also New Jersey's Commercial Bribery statute, N.J.S.A. 2C:21-10, which criminalizes the breach of the fiduciary duty attorneys and physicians have to act disinterestedly with respect to matters involving their clients and patients. Under subparagraph (a) of this statute, a "person commits a crime if he solicits, accepts or agrees to accept any benefit as consideration for knowingly violating or agreeing to violate a duty of fidelity to which he is subject as . . . (3) A lawyer [or] physician." Pursuant to N.J.S.A. 2C:21-10(c), a "person commits a crime if he confers, or offers or agrees to

confer, any benefit the acceptance of which would be criminal under this section."

58.     During an undercover investigation in 2010 and 2011 by agents of the Federal Bureau of Investigation and OIFP, personal injury attorney "V.H.," while acting as a Confidential Witness ("CW"), taped conversations with Scott Greenberg, D.C., during which he discussed at length, *inter alia*, a referral network scheme in which he financed the costs of setting up direct mail advertising campaigns on behalf of multiple personal injury attorneys at an initial cost of $12,000 each, for mailers, setting up multiple office locations, toll-free telephone numbers, etc.  Greenberg also bragged to the CW that it was his idea to send out solicitation packages to the same accident victims from multiple personal injury law firms that were participating in his scheme in order to increase the odds that the recipient would choose one of the law firms whose materials he had helped financed and which would refer the client to one of Greenberg's clinics.

59.     More recently, on July 21, 2016, during his allocution as part of his guilty plea to multiple counts of commercial bribery in a criminal accusation brought by the Attorney General's Commercial Bribery Task Force, Ronald Hayek, D.C., admitted to participating in multiple kickback schemes with providers and personal injury attorneys, including two schemes in which he made a series of payments through intermediaries – one in payment of a television commercial for personal injury attorney, "T.S.," in which images of Hayek and two other doctors were depicted without any reference to their individual or professional practice names, and another in payment of the cost of a telemarketer that he shared with personal injury attorney, "M.R."   Hayek testified that people responding to these advertising efforts were directed to the personal injury attorneys, who in turn referred these patients to him and the other providers who had made payments that subsidized the cost of the attorneys' advertisements.

60.     The healthcare provider-funded attorney direct mail solicitation scheme described by Greenberg, and the attorney advertising schemes involving personal injury attorneys, T.S. and M.R. that Hayek described, are examples of the kinds of solicitation methods that were used by Angelo and the Angelo Marketing Entities, to generate automobile accident injury clients on behalf of the Angelo Network Attorneys using funds provided by the Angelo Network Providers and the Focazio Group in furtherance of the Angelo Referral Network Scheme.

61.     Indeed, the solicitation method that Hayek described and attributed to personal injury attorney, "T.S.," and two other physicians, was operated by Michael Angelo's brother, William James ("Jamie") Angelo and Med-Pro Services, Inc., and likely overlapped with or was a part of the Angelo Referral Network at times Debtor was making payments from Endo and Metropolitan Anesthesia to Michael Angelo and Pacific Marketing in furtherance of the Angelo Referral Network Scheme.

62.     Referral Network Schemes are rife with opportunities for conflicts that extend beyond the decision to make a client/patient referral.   Personal injury attorneys who participate in Referral Network Schemes have a perverse incentive to accept personal injury cases that have little or no genuine value and to mislead clients they receive through such schemes into believing they could receive a settlement even when the attorney knows that is highly unlikely. Attorneys in such schemes are under pressure from Patient Brokers and the participating healthcare providers to "hold" clients who have no realistic likelihood of obtaining a personal injury settlement or recover, meaning to let them continue to believe they have a claim, so they will continue treating with the participating healthcare providers long enough for the providers

to at least recoup the money they gave to the Patient Broker or runner in furtherance of the scheme. Otherwise, the attorney risks no longer receiving any client referrals through the scheme.

63.     The more automobile accident injury clients that are solicited on behalf of participating attorneys, and the more referrals each attorney and provider makes to other providers along the PIP Conveyor Belt, the more money each provider makes from each patient referral received through the Referral Network Scheme.  The more money the participants in the scheme have available to pay to Patient Brokers to spend on solicitation methods, the more automobile accident injury clients and patients they will generate for the Referral Network Scheme in the future.

*Background of Michael Angelo and the Mechanics of the*
*Michael Angelo Referral Network Scheme*

64.     Defendant Angelo has owned directly or through one or more of the Angelo Marketing Entity Defendants more than 100 web domains, most of which pertain to either legal and medical services or gambling and escort services.  Only a few of these domains are associated with active websites.  These include 1800USLawyer.com and 1800Pain800.com, and until the past several years, 1800USHealth.com.

65.     He also has owned, currently owns or has an interest in, more than 50 corporations or limited liability companies in New Jersey, Florida, Michigan and Ohio, most of which have been or are used in furtherance of Angelo's referral network and other fraudulent healthcare schemes.

66.     At all times relevant to the participation by the Focazio Group in the  Angelo

Referral Network Scheme, Defendant Angelo, either directly or through Pacific Marketing, Inc.; Pacific Marketing & Advertising, Inc.; Pacific Media Marketing, Inc.;  Garden State Media, Inc.; Elite Surgical Media Consultants, LLC; Clear Marketing, Inc.; First Holding, LLC; Med-Pro Services, Inc.; NJC Marketing, LLC; Sereno Marketing & Management, LLC;   and/or ABC, Inc. 1-100 (referred to collectively herein as the "Angelo Marketing Entity Defendants"), has owned, controlled and/or utilized several toll-free telephone numbers and related websites for the purported purpose of connecting injured persons to personal injury attorneys and/or to healthcare providers.

67.    Specifically, during times relevant to the participation by the Focazio Group in the Angelo Referral Network Scheme, Defendant Angelo has owned, controlled and/or utilized the following toll-free numbers and related websites in furtherance of the Angelo Referral Network Scheme:

a.  1-800-USLAWYER, a toll-free national number that operates in numerous states including New York, New Jersey, Connecticut and Michigan, and the 1800USLAWYER.com website, which Defendants Angelo and the Angelo Marketing Entities use to connect injured individuals to personal injury attorneys;

b.  1-800-PAIN800, a toll-free national number that operates in numerous states, including New York, New Jersey, Connecticut and Michigan, and the 1-800-PAIN800.com website, which Defendants Angelo and the Angelo Marketing Entities use to connect individuals with certain medical issues with physicians and/or ambulatory surgery centers;

c.  1-800-USHEALTH, a toll-free national number that operates in numerous states, including New York, New Jersey, Connecticut and Michigan, and the

1800USHEALTH.com website, which Defendants Angelo and the Angelo Marketing

Entities us to connect individuals with certain medical issues with physicians and/or

ambulatory surgery centers.

(The 1-800-USLAWYER, 1-800-PAIN800 AND 1-800-USHEALTH and other toll-free

numbers and related websites used by Angelo in furtherance of the Angelo Referral Network

Scheme are collectively referred to herein as the "Angelo 800 Numbers and Domains.")

68.        Although Angelo describes himself as a "marketer," he is in fact not in the

business of "marketing" the services of attorneys and healthcare facilities, but rather in the

business of serving as a "Client/Patient Broker."   As used in this Complaint, the term

"Client/Patient Broker" refers to one, such as Angelo, who refers prospective clients and

patients, or causes them to be referred by inducing others to do so, in exchange for money, or

for other referrals, or on the condition or understanding that the client or patient and/or other

clients or patients, will be referred to certain other attorneys or healthcare providers as

designated by the Client/Patient Broker and with whom he has direct or indirect referral or

kickback agreements.

69.        As a result of these Angelo 800 Numbers and Domains and his experience as a

Client/Patient Broker, Angelo has relationships with numerous personal injury attorneys and

healthcare providers and facilities in New Jersey and other states and is well known as a

Client/Patient Broker who claims to be able to generate referrals of patients to providers.

Indeed, for several years relevant to the participation by the Focazio Group in the Angelo

Referral Network Scheme,  Defendant Angelo advertised on his 1-800-USHEALTH website

that, "We can provide PATIENTS FOR SURGERY CENTERS."

70.     At all times relevant to the participation by the Focazio Group in the Angelo Referral Network Scheme, Angelo, while acting either directly or through one or more entities owned in whole or in part by him, including the Angelo Marketing Entities and on behalf of and/or in concert with participating personal injury attorneys and law firms (collectively, the "Angelo Network Attorneys"); participating chiropractors and other primary providers, including Montana, Barrese and the Montana/Barrese Chiropractic Clinics (collectively, the "Angelo Network Primary Providers"), participating healthcare specialists and diagnostic testing facilities ("Angelo Network Referee Providers") (the Angelo Network Primary Providers and the Angelo Network Referee Providers are collectively referred to as the "Angelo Network Providers"); the ambulatory surgery centers and related anesthesia providers, including Endo and Metropolitan Anesthesia Associates (collectively, the "Angelo Network ASCs"), has acted as a Patient Broker, effectively buying, selling, brokering and directing the referrals of automobile injury clients/patients along the PIP Conveyor Belt in furtherance of the Angelo Referral Network Scheme.

71.     At all times relevant to the Focazio Group's participation in the Angelo Referral Network Scheme, Angelo, in concert with his family members and employees, used the Angelo 800 Numbers and Domains and/or acted under the guise of using the Angelo 800 Numbers and Domains, as well as television commercials, infomercials and direct mail solicitations advertising same, to solicit and recruit, *inter alia*, personal injury clients and PIP patients, which Angelo in turn referred to Angelo Network Attorneys and/or Angelo Network Primary Providers in exchange for commitments to refer those clients and/or patients, as well as additional clients and/or patients, to other Angelo Network Referee Providers as designated by Angelo, including for MUAs, pain management and other procedures performed at Endo under

anesthesia billed in the name of Debtor's Metropolitan Anesthesia Associates, in exchange for kickbacks paid directly or indirectly by the Debtor from the bank accounts of Endo and Metropolitan Anesthesia, and/or by Angelo Network Referee Providers, under the guise of paying for television advertising and/or for receiving referrals from one or more of the Angelo 800 Numbers and Domains in furtherance of the Angelo Referral Network Scheme.

72.    In addition to using the Angelo 800 Numbers and Domains and related television commercials, infomercials and direct mail advertising to solicit and recruit prospective clients and patients, including Allstate Claimants, Angelo also relied upon direct kickbacks in money or in kind, including the reciprocal referrals of clients or patients, to induce the Angelo Network Attorneys and the Angelo Network Primary Providers to refer clients or patients, or to cause them to be referred directly, or through  Angelo Network Referee Providers, for MUAs and invasive pain management and surgical procedures to be performed at Endo under anesthesia billed in the name of Metropolitan Anesthesia Associates, and from which Debtor could profit.

73.    In exchange for these referrals, the Debtor paid millions of dollars in kickbacks to Angelo and the Angelo Marketing Entities from the bank accounts of Endo, Metropolitan Anesthesia and other accounts the Debtor controlled.

*Background of Michael Angelo's Relationship With Personal Injury Attorneys D.D., Esq. and J.D., Esq.*

74.    Angelo's association with personal injury attorneys D.D., Esq. and J.D., Esq., dates back to at least 1999, when they jointly had an interest in two for-profit lawyer referral services:  US Legal Plan, Inc. and AskMeLaw, Inc., both of which registered as fictitious names the web domain, AskMeLaw.com.

75.    Since in or about at least 2001 and throughout the period that the Focazio Group

participated in the Angelo Referral Network Scheme, D.D., Esq. has accepted referrals of patients who responded to ads or mailings for 1-800-USLawyer and/or 1800USLawyer.com and or through other solicitation methods used by Angelo (the "Angelo Solicitation Methods") in exchange for agreeing to refer those clients to providers designated by Defendant Angelo.

76.     During portions of this period, and prior to ending his law partnership with D.D., Esq. in or about 2009, J.D., Esq. also participated in the Angelo Referral Network Scheme.

77.     From in or about 2001 until sometime in 2006, Angelo, Pacific Marketing and certain of the other Angelo Marketing Entities used the 1-800-USLawyer toll-free number and the 1800USLawyer.com domain as a referral service in New Jersey, New York and other states, referring residents of New Jersey who contacted 1-800-USLawyer in response to television commercials and other media, including direct mail solicitations to recent motor vehicle accident victims, to attorneys, including D.D., Esq.;  J.D., Esq. and certain of the other Angelo Attorney Network Defendants on a geographic basis, pursuant to an agreement and/or understanding that the attorneys would in turn refer the clients to providers designated by Angelo, including certain of the Angelo  Network Primary Providers and Angelo Network Referee Providers.

*The New Jersey Supreme Court Committee on Advertising Issues Opinion 38*

78.     On or about September 3, 2004, in response to multiple complaints relating to direct mail solicitation letters from 1-800-USLawyer that were sent to New Jersey residents who had been involved in automobile accidents, the New Jersey Supreme Court Committee on Advertising (the "Committee") issued Opinion 38.   The letters at issue, which displayed both the 1-800-USLawyer phone line and 1800USLawyer.com domain, were addressed to "Recent Car Accident Victim" and stated that "U.S. LAWYER" learned through public records that the

addressee "may have been injured in a recent automobile accident." The letter invited the addressee to call the toll free number "to discuss your accident and potential claim." The letter further stated that a "U.S. LAWYER can meet with you FREE at your home for your convenience, or you are welcome to meet with us at one of our offices." The Committee found that 1-800-U.S.Lawyer was "not a law firm but, rather, appears to be an attorney referral service," and noted that private for-profit referral services are barred by the New Jersey Rules of Professional Conduct 7.3(d).

79.    The Committee noted in Opinion 38 that RPC 7.3(d) prohibits attorneys from "compensat[ing] or giv[ing] anything of value to a person or organization to recommend or secure the lawyer's employment by a client, or as a reward for having made a recommendation resulting in the lawyer's employment by a client . . . . " and that RPC 7.2(c) prohibits a lawyer from "giv[ing] anything of value to a person for recommending the lawyer's services," and provides exceptions solely for non-for-profit legal referral services or organizations listed in RPC 7.3(e), such as certain legal aid offices.

80.    Although Opinion 38 did not identify who was responsible for sending out the offending solicitation letters, and no lawyers were apparently disciplined in connection with this unethical attorney referral scheme, upon information and belief Angelo and Pacific Marketing were responsible for sending out these letters and certain of the Angelo Network Attorneys, including D.D., Esq. and J.D., Esq., were the recipients of client referrals resulting from these letters and other Angelo Solicitation Methods during this period. In exchange for the automobile accident injury clients that were solicited on their behalf, the Angelo Network Attorneys referred and/or caused those clients to be referred to providers designated by Angelo, which providers included certain of the Angelo Network Primary Providers and Angelo

Network Referee Providers.

81.        In exchange for these referrals, these Angelo Network Providers had either made payments to Pacific Marketing and/or one or more of the other Angelo Marketing Entities, they had agreed to refer the patients referred to them by the Angelo Network Attorneys or the Angelo Defendants pursuant to the scheme to the Angelo Network Providers designated by Defendant Angelo.

*Background of Defendant Angelo's Relationship*
*With  Chiropractors Barrese and Montana*

82.        Christopher Montana, D.C. has had a referral and kickback relationship with Michael Angelo and at least certain of the Angelo Marketing Entities since at least 2005.

83.        For example, on or about June 14, 2005, Montana caused a check in the amount of $9,605.00 to be written to Pacific Marketing from the account of a New York clinic that he and/or other individuals unlawfully controlled.  A year later, in June of 2006, when the account of that clinic was closed out, Montana directed the paper owner of that clinic to obtain a cashier's check in the amount of the $26,184.65 balance remaining in that account to be issued and made payable to Pacific Marketing and mailed to the address of Montana's Chiro Center of Elizabeth.

84.        Upon information and belief, these two checks from the account of the medical clinic that Montana unlawfully controlled were made by Montana to Pacific Marketing to pay for patients that Angelo and one or more of the Angelo Marketing Entities referred or caused to be referred to Montana's chiropractic clinics in New Jersey and/or to the clinic he unlawfully controlled in New York.

85.        Beginning in or about 2005, and at or about the same time that Angelo, Pacific

25

Marketing and/or one or more of the other Angelo Marketing Entities began receiving checks from Montana, Angelo and the other Angelo Marketing Entities began causing clients solicited and recruited through 1-800-USLawyer number and one or more of the other Angelo Solicitation Methods to be referred to the Angelo Network Attorneys, including DD, Esq. and JD, Esq., with instructions that they be referred for treatment at Montana's Chiro Center of Elizabeth and/or one of the clinics Montana/Barrese Chiropractic Clinics.

86.     In response to Opinion 38, Angelo, D.D., Esq.; J.D., Esq.; Angelo and the Angelo Marketing Entities, began including the names of D.D., Esq., J.D., Esq. and/or other Angelo Network Attorneys along with the 1-800-USLAWYER toll-free number on the solicitation letters they sent to individuals involved in accidents, instead of using letters written solely in the name of 1-800-USLAWYER.

87.     Although the letters used by Angelo and the Angelo Marketing Entities were changed to give the appearance that the 1-800-USLAWYER solicitation letters were being sent by lawyers, namely D.D., Esq.; J.D., Esq.; or the other Angelo Network Attorneys, the underlying mechanics of the Angelo Referral Network scheme in fact remained unchanged, and Angelo and the Angelo Marketing Companies continued, with the funding provided by the Angelo Network Providers and the Angelo Network ASCs to subsidize the cost of the advertising and direct mail solicitations on behalf of the Angelo Network Attorneys using the Angelo 800 Numbers and Domains and other Angelo Solicitations to operate a commercial referral service in violation of  RPC 7.3(d) and RPC 7.2(c).

*Notebook Maintained by Montana & Barrese Kept Track of Source of Patients, Including those Obtained Through 1-800-USLawyer*

88.      On or about the day after Montana & Barrese's July 27, 2011 arrest by the

Office of the Insurance Fraud Prosecutor, an Allstate investigator recovered from the trash outside of the office of Chiropractic Center of Jersey City, a spiral notebook for the years 2008-2009 in which Montana or Barrese kept a log of each of the patients of that office, including the names of the personal injury attorney representing each patient.

89.      Where the patient indicated they had been sent to Chiropractic Center of Jersey City as a result of 1-800-US Lawyer, a notation of "USL" was made next to the lawyer's name.

90.      The personal injury lawyers listed in the notebook with USL notations next to their names included D.D., Esq.; J.D., Esq., and other Angelo Network Attorneys, including C.K., Esq.

*Montana and Barrese Wrote at Least $177,000.00 in Checks to Pacific Marketing in Furtherance of the Angelo Referral Network Scheme*

91.      Over the course of much of the same period covered by the 2008-2009 Notebook, Montana and Barrese caused at least 22 checks, totaling $177,290.15, to Pacific Marketing.

92.      Only one of these checks, Check No. 2070, dated July 25, 2008 in the amount of $10,000 bore a memo notation, which stated "Advertising."

93.      Sixteen of these checks were cashed by unlicensed check cashers using accounts in the name of DJC Factoring or Advance Financing.

94.      These checks were written to Pacific Marketing and the cash proceeds of these checks were used in furtherance of the Focazio-Angelo Referral Network Scheme.

95.      These cashed checks were part of a much larger cash-generation scheme engaged in by Montana, Barrese and the Montana/Barrese Chiropractic Clinics using the DJC Factoring, and Advance Financing accounts, as well as an account in the name of Lincoln Financial.

96.      Through discovery in a third-party personal injury case referred to herein as the "*P Litigation*," Allstate learned that Montana and Barrese cashed at least $850,000 in checks that were drawn primarily on accounts they owned and that were made payable to other business entities they owned, as well as to a variety of other recipients, including Pacific Marketing.

97.      This $850,000 amount understates the total amount of checks the Montana/Barrese Group laundered through these unlicensed check cashers. For example, subpoenas served in the *P. Litigation* on the bank accounts of "A&A," the Jersey City personal injury law firm that had initially represented the plaintiffs in the *P. Litigation*, revealed additional checks that the A&A law firm had written from their attorney trust accounts to the Montana/Barrese Chiropractic Clinics and that were cashed by these unlicensed check cashers.

98.      The A&A law firm is listed numerous times in the 2008-2009 Notebook as representing patients of the Montana/Barrese Chiropractic Clinics.

99.      One of the principals of A&A, "M.A, Esq." pleaded guilty on May 7, 2015 to one count in a Federal Indictment charging him with structuring transactions to evade reporting requirements between December 8, 2009 and January 30, 2012.  On January 30, 2017, the Hon. William H. Walls, Senior U.S. District Judge, sentenced M.A., Esq.  to probation, including a 7-month period of home confinement.  In addition, M.A., Esq., was ordered to pay restitution in the amount of $200,000 and a $2,000 fine.

100.     Because the plaintiffs in the *P. Litigation* dismissed their complaint against Allstate's insured before the bank records of these unlicensed check cashers were produced, Allstate was not able to determine the total amount of funds cashed by or on behalf of the Montana and Barrese Chiropractic Clinics and whether Angelo and/or the Angelo Marketing

Entities also cashed checks it received from providers or ASC owners with these same
unlicensed check cashers.

> *Defendant Michael Angelo's Early Fee-Splitting Agreement with Focazio and
> the Focazio Group*

101.     Angelo and Focazio entered into an unlawful kickback and/or fee-splitting
arrangement in 2006, which lasted until they had an acrimonious falling out in mid-2011.

102.     Angelo described his introduction to, and subsequent financial arrangement with,
Focazio in an extraordinarily revealing Verified Complaint he filed in <u>Michael Angelo, et al. v.
Dr. William J. Focazio, et al.</u>, Docket No. L-8733-11 in the Superior Court in Bergen County on
October 20, 2011 (the "*Bergen County Complaint*").   Angelo alleged that Focazio was
experiencing financial problems and wanted to "move into a different field with Angelo . . . .he
was interested in performing more work with personal injury attorneys."   Specifically, Angelo
alleged that "Focazio was interested in leveraging Angelo's relationship with personal injury
attorneys," and that he was interested in hiring Pacific Marketing "to provide marketing and
networking services for Endo."

103.     In an effort to conceal the existence and nature of their referral and kickback
arrangement, Angelo and Focazio initially decided not to commit their agreement to writing.
This verbal agreement, which existed from in or about September of 2006 until April of 2007,
when Angelo and Focazio entered into a written kickback agreement, entitled "Exclusive
Marketing Agreement," is referred to herein as the "Focazio-Angelo Verbal Kickback
Agreement."

104.     In a further effort to conceal both the existence and nature of the Focazio-Angelo
Verbal Kickback Agreement, during the period of the scheme that preceded April of 2007,

Focazio made the kickback payments to Angelo in cash and/or to Pacific Marketing by checks that falsely indicated that the payments were made for marketing or advertising expenses, when in fact the payments constituted kickbacks that Focazio understood that Angelo was going to use to generate patient referrals to the Angelo Network Providers and in exchange for which they would perform their procedures on them at Endo.

105.    Pursuant to the Focazio-Angelo Verbal Kickback Agreement, Angelo began causing claimants to be referred for procedures at Endo in September of 2006. For example, Angelo acting either directly or through Montana and/or Barrese, Chiropractic Centre of Newark, Defendants John Doe 1-100 and/or XYZ, P.C. 1-100, caused Allstate claimants G.L. 4125036832-01; C.A. 4125039975-04; and R.Z. 4125020570-01 to be referred to Endo for procedures to be performed under anesthesia on September 21, 2006, October 5, 2006 and October 19, 2006, respectively, in furtherance of the Focazio-Angelo Referral Network Scheme.

106.    Each of these three Allstate claimants was a patient of Montana and Barrese's Chiropractic Centre of Newark and was represented by the law firm of "C.K., Esq.," which was an Angelo Network Law Firm.

107.    Prior to the treatment of claimant G.L. 4125036832-01 on September 21, 2006, an average of only one Allstate claimant a year had undergone procedures at Endo between then and the date it was first licensed by DHSS on January 7, 2003.

108.    Angelo either directly and/or through one of the Angelo Marketing Entities received kickbacks from the Focazio Group in exchange for these referrals, under the guise of payments for "marketing" or "networking" services.  Angelo used these funds and payments from other Angelo Network Providers, to pay for television commercials using 1-800-USLawyer and to fund other Angelo Solicitation Methods, including the unlawful use of

telemarketers and runners to contact automobile accident victims, to solicit automobile accident victims on behalf of the Angelo Network Attorneys.     In exchange for the payments by the Focazio Group and the Angelo Network Providers to fund these  Solicitation Methods in whole or in part, and in exchange for the automobile accident injury clients they received through the Focazio-Angelo Referral Network Scheme, these Angelo Network Attorneys in turn referred these clients to the Angelo Network Providers, including the Barrese/Montana Chiropractic Clinics, which in exchange for these referrals referred them to other Angelo Network Providers, with the understanding that MUAs, pain management and other procedures performed under anesthesia would be performed at Endo.

109.     In addition to in-kind kickbacks in the form of reciprocal referrals, Angelo used the funds that Focazio paid to the Angelo Marketing Entities to pay cash kickbacks to generate referrals of patients to the Angelo Network Providers for procedures to be performed at Endo in furtherance of the Focazio-Angelo Referral Network Scheme.

110.     The amount of the kickbacks that Focazio paid to the Angelo Marketing Entities in the form of checks for purported advertising or marketing expenses, equaled approximately half of the net profit earned by the Focazio through facility fees charged by Endo in connection with PIP patient referred through the Focazio-Angelo Referral Network Scheme..

111.     Between September of 2006 and April of 2007, at least 26 Allstate claimants were referred for procedures to be performed at Endo as a result of the payments of Focazio-Angelo Verbal Kickback Agreement.

*Angelo and Focazio Enter Into a Written Agreement Intended to Both Memorialize Their Kickback Agreement and to Conceal Its True Purpose*

112.     In April of 2007, Angelo and Focazio decided to memorialize their agreement in

a writing that was entitled, "Exclusive Marketing Agreement."  A true and correct copy of this

agreement, which is hereinafter referred to as the "April 2007 Exclusive Marketing Agreement"

is attached to this complaint as "**Exhibit A**."

113.     Pursuant to the April 2007 Exclusive Marketing Agreement, Angelo and Pacific

Marketing agreed to "(i) assist Endo in the marketing of Endo's services within the Territory;

and (ii) to provide management and aid in administrative support services to Endo, from

inception of such engagements through their completion."

114.     Nowhere in the April 2007 Exclusive Marketing Agreement did the parties

attempt to define or describe in more than the most general terms the services that would be

performed by Angelo and/or Pacific Marketing.

115.     For example, pursuant to Paragraph 1.3 of the Agreement, Defendants Angelo

and Pacific Marketing agreed to "vigorously promote Endos' Services, beginning as soon as

feasible after the date of this Agreement, using sound method, exercising  diligence, and

adhering to generally known standards for the promotion of such Services."  This paragraph

also required Angelo and Pacific Marketing to "advertise the Services within the Territory and

directly solicit Endo's Services to potential Customers."  While this section required Angelo

and Pacific Marketing to use "reasonable efforts" to keep Focazio "apprised of Pacific's plans

and efforts with respect to such promotions," the agreement further provided that Angelo and

Pacific Marketing "shall have complete discretion with respect to all decisions."

116.     As Angelo explained in the *Bergen County Complaint*, this "agreement provided

that Pacific [Marketing] would be the exclusive marketing service used by Endo."

117.     Yet, despite Focazio's agreement to give Angelo and Pacific Marketing the

exclusive right to market Endo's services, and the lack of any meaningful description of the

32

services that Angelo and Pacific Marketing were required to render pursuant to their Agreement, Focazio and Endo agreed in Paragraph 3 of the Agreement that Endo "shall pay Pacific on the 15th of each month commencing on April 15, 2007, fifty percent (50%) of the net profits for all business obtained through Pacific's efforts."

118.    It was at all times the agreement and understanding of Angelo and Pacific Marketing and Focazio and Endo when they entered into the April 2007 Exclusive Marketing Agreement that Angelo and Pacific Marketing would use certain of the Angelo 800 Numbers and Domains to obtain clients for the Angelo Network Attorneys and patients for Angelo Network Providers and cause them to be referred to Endo for MUAs, pain management and surgical procedures under anesthesia that would be billed for by Metropolitan Anesthesia Associates, as part of their obligation pursuant to the April 2007 Exclusive Marketing Agreement to "vigorously promote" Endo.

119.    The decision to enter into the April 2007 Exclusive Marketing Agreement was driven at least in part by Defendant Angelo's desire to make clear in the agreement that he and Pacific Marketing would have the exclusive right to be paid to solicit providers to refer patients for procedures at Endo and in exchange for payments from Focazio, which would limit Focazio's ability to "cut out the middleman" and make his own direct kickback deals with the Angelo Network Attorneys and the Angelo Network Providers, or to make deals with other patient brokers.

120.    The decision to enter into the April 2007 Exclusive Marketing Agreement was also driven in part by a desire on the part of Focazio to ensure that the share of the profits he was agreeing to pay Angelo and Pacific Marketing would not be used by them to solicit or recruit claimants or buy patients that they would then sell to other ASCs.

33

121.    But while Angelo and Focazio prepared the April 2007 Exclusive Marketing Agreement to address these issues, and to create a seemingly legitimate basis for the checks that Focazio would write from the accounts of Endo and Metropolitan Anesthesia Associates to Angelo, Pacific Marketing and/or the other Angelo Marketing Entities, they were very careful to keep the terms of the agreement extremely vague in order to conceal the unlawful nature and scope of the Agreement and the Focazio-Angelo Referral Network Scheme.

122.    For example, Angelo and Focazio intentionally kept out of the April 2007 Exclusive Marketing Agreement any mention of 1-800-USLAWYER or of the other Angelo 800 Numbers and Domains, notwithstanding that each knew that Angelo's relationships with personal injury attorneys was based on 1-800-USLAWYER and the other Angelo 800 Numbers and Domains, and that he could use these telephone numbers to solicit prospective clients/patients and steer them to the Angelo Network Attorney and the Angelo Network Providers on the condition they would refer or cause those clients/patients to be referred for procedures to be performed at Endo.

123.    Until Angelo and Focazio had a falling out in 2011, the Focazio-Angelo Referral Network Scheme succeeded in generating enormous volumes of patient referrals to Endo, and Focazio paid Angelo, Pacific Marketing and the other Angelo Marketing Entities enormous sums from Endo's account.   According to the *Bergen County Complaint*, Endo paid Angelo and Pacific $733,964.18 for 2007; $2,785,000.00 for 2008; $3,320,000.0 for 2009; $2,252,800.00 for 2010 and $650,000.00 for 2011.

124.    Angelo claimed in the *Bergen County Complaint* that from the inception of the April 2007 Exclusive Marketing Agreement to the October 20, 2011 dated of the *Bergen County Complaint*, Endo paid Pacific Marketing and Angelo $9,741.764.18.

125.    In a certification Focazio executed on or about November 18, 2011, Focazio

claimed that the total amount the Focazio Group paid to Angelo and/or the Angelo Marketing

Entities was actually $11,079,422.

*The Massive Scale of the Focazio-Angelo Referral Network*
*Scheme, and the Enormous Cost it Imposed on Allstate*

126.    As Angelo stated in the *Bergen County Complaint*, the "impact of Pacific's

marketing efforts was tremendous. . . . The business grew exponentially, as did the revenue for

the facility."

127.    Allstate's records of the amounts it paid to Endo from 2006 to 2011 bear out

Angelo's claim, and reflect the enormous cost that the $9,741.764.18 in kickbacks paid by Endo

to Angelo and Pacific Marketing in furtherance of the Focazio-Angelo Referral Network

Scheme imposed on Allstate:

| Year | Payments to Endo | Payments to Metropolitan Anesthesia | Combined Total |
|---|---|---|---|
| | | | |
| 2006 | 33,821.03 | | 33,821.03 |
| 2007 | 204,705.38 | | 204,705.38 |
| 2008 | 943,999.73 | 142,618.93 | 1,086.618.66 |
| 2009 | 1,996,336.61 | 391,459.96 | 2,387,796.57 |
| 2010 | 2,314,060.01 | 364,555.16 | 2,678,615.26 |
| 2011 | 1,408,912.79 | 286,885.23 | 1,695,798.02 |
| 2012 | 652,109.82 | 112,523.99 | 764,633.81 |
| 2013 | 146,406.36 | 30,578.35 | 176.984.71 |
| | | | $9,028,973.44 |

Case 20-01004-VFP    Doc 1    Filed 01/03/20    Entered 01/03/20 17:28:51    Desc Main
Document      Page 36 of 62

128.     That Endo's $9,741.764.18 in payments to Angelo and Pacific Marketing between 2007 and 2011 were kickbacks and not legitimate "marketing" payments is demonstrated not only by the vague language of the April 2007 Exclusive Marketing Agreement, but also by the abrupt drop-off in Endo's billings when Angelo shifted the patient referrals he was generating through the Angelo Referral Network Scheme away from Endo to other ASCs.

129.     At all times relevant to this litigation, Focazio knew and understood that  by entering into the April 2007 Exclusive Marketing Agreement with Angelo, he was  agreeing to purchase the exclusive referrals of clients/patients that Angelo and the Angelo Marketing Entities would attract and recruit through the Angelo 800 Numbers and Domains and the other Angelo Solicitation Methods, and whose referrals they would unlawfully induce to be made to Endo by the Angelo Network Attorneys and the Angelo Network Providers.

130.     The effect of the Focazio-Angelo Referral Network Scheme on the profits of Endo was enormous, enabling Focazio to pay Angelo and Pacific Marketing more than $11 million between 2006 and mid-2011.

131.     During the period between April 1, 2007 and October 11, 2011, the date that Angelo filed the *Bergen County Complaint*, approximately 416 Allstate Claimants underwent procedures at Endo.   All of these were the result of the payments of kickbacks by Focazio, Endo and/or Metropolitan Anesthesia in furtherance of the Focazio-Angelo Referral Network Scheme and under the guise of paying for "marketing" services pursuant to the April 2007 Exclusive Marketing Agreement.

*Referrals to Endo Were Also Referrals for Anesthesia Services*
*Billed by Endo or Metropolitan Anesthesia*

36

132.    From September of 2006 until May 17, 2008 every Allstate Claimant and other patient who was referred to Endo for MUAs, pain management procedures and surgeries pursuant to the Focazio-Angelo Referral Network Scheme also received anesthesia services that were billed in the name of Endo.

133.    From on or about May 17, 2008 when Metropolitan Anesthesia began billing for anesthesia services on all patients at Endo until October 11, 2011, each and every Allstate Claimant who underwent a procedure under anesthesia at Endo also received anesthesia services for which Allstate was billed in the name of Metropolitan Anesthesia.

134.    At all times relevant to Focazio's participation in the Focazio-Angelo Referral Network Scheme, Metropolitan Anesthesia was owned by Focazio alone and/or with Angelo.

135.    Accordingly, every Allstate Claimant who was referred to Endo for a procedure from May 17, 2008 until October 11, 2011 was effectively also referred to Metropolitan Anesthesia for anesthesia services.

136.    Between  May 17, 2008 and the filing of the Bergen County Complaint on October 11, 2011, 309 Allstate claimants received anesthesia services that were billed to Allstate in the name of Metropolitan Anesthesia in furtherance of the Focazio-Angelo Referral Network Scheme.

137.    Between August 15, 2007 and May 17, 2008, 91 Allstate claimants received anesthesia services that were billed to Plaintiffs in the name of Endo.

138.    Because each and every Allstate Claimant who underwent a procedure at Endo from September 11, 2007 until the present also received anesthesia services for which Allstate was billed in the name of either Endo and/or Metropolitan Anesthesia, each and every Allstate Claimant that was referred to Endo for procedures in furtherance of the Focazio-Angelo

Referral Network Scheme was for which  paid a share of net profits to the Angelo Parties

pursuant to the April 2007 Exclusive Marketing Agreement constituted a kickback not only for

the referral of each such Allstate Claimant for procedures to be performed at Defendant ESCNJ,

but also for the referral of each such claimant for anesthesia services to be billed in the name of

Metropolitan Anesthesia or ESCNJ.

> *Focazio's Payments of More than $11 Million to*
> *Angelo and Pacific Marketing for Referrals to Endo and Metropolitan*
> *Anesthesia Constituted Referral Fees in Violation of N.J.A.C. 13:35-6.17(c)*

139.    The regulations of the Board of Medical Examiners defines "Health care service"

in N.J.A.C. 13:35-6.17(a)1 as follows:

> "Health care service" means a business entity which provides on an in-
> patient or out-patient basis: testing for or diagnosis or treatment of human
> disease or dysfunction or dispensing of drugs or medical devices for the
> treatment of human disease or dysfunction.   Health care service includes,
> but is not limited to, a bioanalytical laboratory, pharmacy, home health
> care agency, nursing home, hospital, or a facility which provide
> radiologic or other diagnostic imaging services, physical therapy,
> ambulatory surgery, or ophthalmic services.  [Emphasis added.]

140.    Defendants Endo and Metropolitan Anesthesia are "Health care services" as

defined by N.J.A.C. 13:35-6.17(a)1.

141.    The anti-kickback regulations of the Board of Medical Examiners expressly

provide pursuant to N.J.A.C. 13:35-6.17(c) the following:

> 1.  A licensee shall not, directly or indirectly, give to or receive from any
>     licensed or unlicensed source a gift of more than nominal (negligible)
>     value, or any fee, commission, rebate or bonus or other compensation
>     however denominated, which a reasonable person would recognize as
>     having been given or received for or to promote conduct by a licensee
>     including: . . . . making or receiving a referral to or from another for
>     professional services.  For example, a licensee who refers a patient to
>     a health care service (such as a cardiac rehabilitation service or a
>     provider of durable medical equipment or a provider of testing
>     services) shall not accept from nor give to the health care service a

fee directly or indirectly in connection with the referral, whether denominated as a referral or prescription fee or consulting or supervision fee or space leasing in which to render the services (other than as permitted in (h) below), or by any other name, whether or not the licensee has a financial interest as defined in (a) above. [Emphasis added].

142.    N.J.A.C. 13:35-6.17(c)(1)(ii) further provides that "[t]his section shall be construed broadly to effectuate its remedial intent."

143.    The payment of more than $11 Million in kickbacks between September 2006 and October 11, 2011 by Focazio, Endo or Metropolitan Anesthesia to Michael Angelo and Pacific Marketing pursuant to the Angelo Verbal Kickback Agreement and the April 2007 Exclusive Marketing Agreement was clearly "given . . . to promote conduct by a licensee including: . . . . making or receiving a referral to or from another for professional services."

144.    Indeed, at all times relevant to this litigation, the Debtor understood that because of the nature of the services that Angelo and the Angelo Marketing Entities provide, that Angelo would necessarily need to cause referrals to be made between and among multiple healthcare licensees before the patients, including the Allstate Claimants, would be referred for procedures to be performed at Endo.

145.    As a result of the payments to Angelo pursuant to the Verbal Kickback Agreement and the April 2007 Exclusive Marketing Agreement in exchange for causing patients to be referred between and among the Angelo Network Providers and ultimately in the case of the Allstate Claimants, for procedures to be performed at Endo and for anesthesia services billed in the name of Metropolitan Anesthesia and/or Endo, every procedure performed at Endo an Allstate Claimants was performed in violation of N.J.A.C. 13:35-6.17(c).

*Since April of 2008, Angelo has had a Concealed Financial Interest in Metropolitan Anesthesia in Violation of the Practice Structure Regulations of the Board of Medical Examiners.*

146.    One year after entering into the April 2007 Exclusive Marketing Agreement, and in an effort to create a seemingly legal entity through which he could earn revenue from the anesthesia services that were performed on Allstate Claimants that were referred to Endo through the Focazio-Angelo Referral Network Scheme, Focazio caused Metropolitan Anesthesia, LLC to be formed in his name.

147.    Although the certificate of formation for Metropolitan Anesthesia refers only to Focazio as a member, Angelo in fact at all times had a concealed financial interest in Metropolitan Anesthesia.

148.    In a "Supplemental Certification" he executed on November 28, 2011, Angelo admitted that he was a "co-owner of Metropolitan Anesthesia with [the Debtor] based on an oral agreement between us."  Angelo also stated that in conversations with Joseph Aboyoun, Esq., an attorney who jointly represented him and the Debtor in their dealings, Aboyoun represented to Angelo on "multiple occasions" that he and the Debtor were "partners in everything."

149.    It was a violation of the practice structure regulations of the New Jersey Board of Medical Examiners, N.J.A.C. 13:35-6.16 for Angelo, or any other non-licensee, to have any interest in Metropolitan Anesthesia.

150.    Accordingly, the services rendered by Metropolitan Anesthesia between May of 2008 and October 11, 2011 on Allstate Claimants that were referred to Endo were rendered in violation of N.J.A.C. 13:35-6.16.

151.    PIP insurers such as Plaintiffs have no obligation under <u>N.J.S.A.</u> 39:6A-1, *et seq*., or other applicable No Fault law to make any payments in connection with the provision of

PIP medical services that were not rendered in accordance with all applicable regulations or statutes governing the provision of those services.

152.     Because the PIP medical services allegedly provided by Endo Metropolitan Anesthesia were rendered to the Allstate Claimants in violation of <u>N.J.A.C.</u> 13:35-6.17(c) or N.J.A.C. 13:44E-2.6 and the services rendered by Metropolitan Anesthesia were rendered in violation of N.J.A.C. 13:35-6.16, Allstate had no obligation to make any payments to either Endo or Metropolitan Anesthesia for any PIP medical services they allegedly provided to the Allstate Claimants before October 11, 2011.

*Crosstown Medical:  Ownership, Control and Illegal Self-Referrals*
*Debtor is a Nominal or Sham Owner of Crosstown Medical*

153.     Crosstown Medical was incorporated in New York on February 15, 2018 and has a primary business address of 625 E. Fordham Road, Bronx, New York 10458.

154.     The Debtor, a New Jersey resident, has identified himself as the sole owner of Crosstown Medical.

155.     The Debtor is, however, a nominal or sham owner of Crosstown Medical with no true ownership or control over the operation of the medical practice that he purportedly owns.

156.     Upon information and belief, the Debtor, does not control the type and nature of medical services provided by the Crosstown Medical.

157.     Additionally, the Debtor does not directly provide services to patients of Crosstown Medical; patients receive medical services through other healthcare professionals employed or contracted by or on behalf of Crosstown Medical.

158.     This model where the nominal physician owner does not possess operational control over a medical practice  in this case, Crosstown Medical, and where all ownership of the

assets of the medical practice are vested as collateral in the name of others results in medical practices which are controlled and operated by non-licensees ("Controlled Practices").

159.     The Controlled Practices generally are started and funded without any contribution from, or liability on the part of, the Debtor or the other Paper Owners, and are unlawfully controlled by non-licensees in violation of the healthcare regulations of New York and New Jersey.

160.     Upon information and belief, no meaningful funds were invested by the Debtor to start up Crosstown Medical and start-up funding came from investors in the medial practice.

161.     A JP Morgan Chase bank account (hereinafter, "JPMC"), bearing an account number ending with – 6158, was opened in the name of Crosstown Medical with a $100 cash deposit on April 17, 2018, approximately two months after Crosstown Medical was formed.

162.     Thereafter, two deposits totaling $27,600, comprised of an ACH payment of $9600 on May 6, 2018 and a wire transfer $18,000 on May 18, 2018, were deposited into the Crosstown Medical JMPC account from the account of Interstate Multi-Specialty Group, P.C., (hereinafter "Interstate"), a New Jersey entity.

163.     The following month, an ACH payment of $4000 and a wire transfer in the amount of  $3,000 were deposited on June 1, 2018 and June 4, 2018, respectively, into the Crosstown Medical JPMC bank account from Interstate's account.

164.     Interstate was a New Jersey professional corporation formed on August 27, 2013 and owned by Alexandr Zaitsev, M.D.

165.     Alexandr Zaitsev, M.D., ("Zaitsev"), is and has been a licensed physician in good standing in both New Jersey and New York, although he allowed his license in New Jersey to lapse between February and June of 2019.

42

166.     In June 2018,  and the months that followed, substantial funds were also transferred either by wire or through ACH payments to the Crosstown Medical JPMC account from Financial Vision Group, LLC, ("Financial Vision Group").

167.     These deposits from Financial Vision Group ranged from $64,000 in June 2018 to as much as $176,000.00 in April, 2019.

168.     Financial Vision Group is a Delaware limited liability company formed on April 6, 2018, just two weeks before the Crosstown Medical JPMC bank account was opened.

169.     Alexandr Zaitsev is a member of Financial Vision Group.

170.     Daniel Khandarov, a non-licensee, is also a member of Financial Vision Group.

171.     Financial Vision Group may have other members, some of whom may be non-licensees, who are not currently known to the Plaintiffs.

172.     Financial Vision Group and its members, and other non-licensees, are the true owners of Crosstown Medical which they illegally control through a series of complex financial instruments and agreements, by controlling the source of referrals of patients, and/or by controlling the physical premises where the services are rendered.

173.     Moreover, Financial Vision Group, by and through members, uses Crosstown Medical as a vehicle to create illegal patient referrals to other medical and health care entities owned by some or all of its members, thus controlling all referrals and creating an inclusive self-contained and self-propagated patient referral network,

174.     In October 2018, a UCC-1 Financing Statement, (hereinafter "UCC lien") was filed by the Lake Success, New York law firm of Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wolf & Carrone, LLP, (hereinafter "Abrams Fensterman"), as against Crosstown Medical on behalf of Financial Vison Group, LLC, rendering it a secured creditor.

43

175.     Pursuant to the terms of Exhibit A to the UCC lien, the collateral amount identified by Financial Vision Group includes "all Claims upon which Advances were made; all Proceeds of Eligible Accounts Receivable, wherever located; and all Cash in the Deposit Account."

176.     The Deposit Account is identified in the UCC lien as the JP Morgan Chase account of Crosstown Medical while "Claims" are broadly defined to include all present and future rights of Debtor Crosstown Medical to payment for medical services render arising out of New York No Fault auto claims, Workers compensation claims and any major medical or health care claims for which Crosstown had obtained assignment.

177.     The only exclusions from the definition of Claims in the UCC lien are for any Medicare or Medicaid claims or those claims legally not subject to UCC liens.

178.     In sum, almost all of the monies received by Crosstown Medical from insurers as well as those in the Crosstown Medical bank account are subject to the Financial Vison Group lien.

179.     Debtor also does not have control over the funds received by Crosstown Medical from insurers such as Allstate for alleged medical services provided by Crosstown Medical.

180.     Indeed, the payments for alleged medical services made to Crosstown Medical by Allstate are not deposited into the Crosstown Medical JPMC bank account but rather are deposited into one of two Hanover Bank accounts which end in - 0199 and - 0450.

181.     The -0450 Hanover Bank account is an Abrams Fensterman New York IOLA account held in the name of Financial Vision Group, and checks from insurance proceeds issued to Crosstown Medical and other Controlled Practices are deposited into this account.

182.     On December 5, 2019, Plaintiffs issued a subpoena to Hanover Bank to ascertain

the owner of the -0199 Hanover Bank account and for production of the account opening

documents, but no response has yet been received.

183.        The principal means by which non-licensees exercise control over Crosstown

Medical and the other Controlled Practices is through the use of complex financial agreements.

These financial agreements are administered by law firms such as Abrams Fensterman, which

acts both as "Collection Counsel" for Crosstown Medical and numerous others related

Controlled Practices, and as the "Receiver" for the lender, Financial Vision Group.

184.        As lender, Financial Vision Group provides advance funding through a revolving

credit line for both start-up and ongoing funding for the Controlled Practices at usurious interest

rates.

185.        These exorbitant rates, and other terms in the financial agreements make it

impossible for Debtor or the other nominal physician owners of the Controlled Practices to earn

any profit from the Controlled Practices beyond a stipend of several thousand dollars a month.

186.        Additionally, the advanced amounts provided by Financial Vision Group and

other funding companies that are participating in the scheme, do not remain in the accounts of

the Controlled Practices.  Rather, the funds are almost immediately siphoned off through

electronic transfers and checks to other entities that allegedly provide services to the Controlled

Practice.

187.        The JPMC Crosstown Medical bank account shows the same pattern of large

advances which are almost immediately disbursed through multiple wire transfers and some

checks written from the account. On a number of occasions, the disbursements are made so

hastily that an insufficient funds notice is triggered as the banking processes may not have fully

cleared the funds deposited.

188.    New York law specifically prohibits non-licensees from owning or controlling professional corporations providing medical services. See, e.g., Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389, 406-07 (2019) ("control of a professional corporation by nonprofessionals violates foundational New York licensing requirements…."); State Farm Mut. Auto. Ins. Co. v. Mallela, 372 F3d 500, 503 (2d Cir 2004); and 11 NYCRR 65-3.16(a).

189.    Under New York law, control of a professional corporation by non-professionals renders the corporation ineligible for insurer reimbursement. Carothers, supra 33 N.Y.3d at 406-407.

190.    Because Crosstown Medical was controlled by Financial Vision Group investors, which include non-licensees, Abrams Fensterman, and other non-licensees whoare unknown to Plaintiffs at this time and its now owned by Debtor, only on paper.  Crosstown Medical was not eligible for any No Fault medical benefit payments that it received from the Plaintiffs.

*Crosstown's Referrals to Entities Owned by Financial Vision Group Physician-Investors*

191.    Crosstown Medical's referrals of patients, including Allstate claimants, to Ridgewood Diagnostic Laboratories and other professional corporations, including ABC Corp., P.C. 1-50, (fictitiously named entities), constitute illegal self-referrals that violate New York and New Jersey laws prohibiting physician self-referrals.

192.    Ridgewood Diagnostic Laboratories, LLC, (hereinafter "Ridgewood Labs"), is a New Jersey Limited Liability Corporation formed in July 22, 2014.  In 2016, the registered agent and office for Ridgewood Labs was identified as Alexandr Zaitsev, with an address of 201 Route 17 North, 10th Floor, Rutherford, NJ  07070.  In 2018, the registered office was changed for Ridgewood Labs to 126 State Street, 2nd Floor, Hackensack, NJ  07601.   The registered agent for Ridgewood Labs continued to be Alexandr Zaitsev.

193.    An initial application for New Jersey and CLIA laboratory certification filed by Ridgewood Labs in November 2016 with the New Jersey Department of Health ("NJDOH"), identified Alexandr Zaitsev, with an address of 25 Knoll Road in Wayne, NJ  07470, as the owner of Ridgewood Labs.

194.    Upon information and belief, the 25 Knoll Road, Wayne, NJ address is the residence of Zaitsev.

195.    Between October 25, 2018 and July 31, 2019, Crosstown Medical made more than 25 patient referrals for laboratory services to Ridgewood Diagnostics, despite the fact that Crosstown is located in the Bronx, New York and Ridgewood Labs is located in Hackensack, New Jersey.

196.    Additionally,  Zaitsev also is an owner of Financial Vision Group which invests in Crosstown Medical through advances and which has an ownership interest in the Crosstown Medical accounts and receivables.

197.    The referrals from Crosstown Medical, of which Zaitsev is a concealed owner, to Ridgewood Labs, of which Zaitsev is also an owner, comprise illegal self-referrals prohibited under both New York and New Jersey laws and regulations.

198.    Ridgewood Labs provides clinical laboratory services as defined at New York Public Health Law Section  238.

199.    Ridgewood Labs is a health care service as defined by N.J.S.A. 45.9-22-4 and N.J.A.C. 13:35-6.17(a)(1).

200.    Pursuant to New York the Public Health law, physician self-referrals generally are prohibited except for a few exemptions which do not apply here to the referrals between Crosstown Medical and Ridgewood Labs.  New York Public Health Law Section 238-A.

Included in this prohibition is, "an arrangement or scheme, such as a cross-referral arrangement, where the practitioner or health care provider knows or should know, has a principal purpose of assuring referrals by the practitioner for clinical laboratory services…to a particular health care provider, which if the practitioner directly made referrals to such health care provider, would be in violation of subdivision one of this section."  New York Public Health Law Section 238-A9.

201.    The statute defines a "financial relationship" as an "ownership interest, investment interest or compensation arrangement."  New York Public Health Law Section 238(3).

202.    Additionally, an interested investor is defined as "an investor who is a practitioner in a position to make or influence referrals or business to the health care provider…" New York Public Law Section 238(9).

203.    Zaitsev is an interested investor by virtue of his control of Crosstown Medical and the investments he has made therein through Interstate and Financial Vision Group.

204.    Moreover, pursuant to New York law, both the referring practitioner or the health care provider furnishing the clinical laboratory services or any other person who collects any monies that were billed in violation of the self-referral prohibition, shall be jointly and severally liable to the payor for the amounts collected.  Thus, both Crosstown Medical and Ridgewood Labs are jointly liable for the amounts paid by Plaintiffs to both entities for services arising out of and related to the illegal self-referrals.  New York Public Health Law Section 238-A7.

205.    New Jersey law, known as the Codey Law, N.J.S.A. 45:9-22.5, also prohibits a practitioner from referring patients to a health care service in which he/she has a financial interest, including laboratories, except in a few exempted situations, none of which apply to the

referrals between Crosstown Medical and Ridgewood Labs.

206.    The New Jersey Board of Medical Examiners (hereinafter "BME"), regulations also prohibit physicians from referring or directing an employee to refer patients to a health care service in which the physician or a direct family member has a significant beneficial interest. N.J.A.C. 13:35-6.17(b).

207.    Significant beneficial interest is defined in both the Codey Law and BME regulations to mean any financial interest. N.J.A.C. 13:35-6.17(a)(1).

208.    Zaitsev's interest in Crosstown Medical and Ridgewood Labs constitutes a significant financial interest a defined by the Codey Law and the New Jersey BME regulations.

209.    The referrals from Crosstown Medical of its patients, including the Allstate Claimants, to Ridgewood Labs violated both the Codey Act and the New Jersey BME regulations that prohibit physician self-referrals where Zaitsev and others have a significant beneficial interest in Crosstown Medical and Ridgewood Labs.

210.    PIP insurers such as Plaintiffs have no obligation under N.J.S.A. 39:6A-1, *et seq.*, or other applicable No Fault law to make any payments in connection with the provision of PIP medical services that were not rendered in accordance with all applicable regulations or statutes governing the provision of those services. *See also* Allstate Ins. Co. v. Orthopedic Evaluations, Inc., 300 N.J. Super. 510, 516 (App.Div.1997) (Any healthcare service authorized by the [Automobile Reparation Reform Act, N.J.S.A. 39:6A-1 to -35] must also comply with any other significant qualifying requirements of law that bear upon rendition of the service ... it is only logical that providers and services which are covered by other requirements of law must conform with pertinent norms as a precondition of eligibility under the Act.

211.    Because the PIP medical services allegedly provided by Crosstown Medical and

Ridgewood Labs were the result of illegal self-referrals in violation of the Codey Law and the

New Jersey BME regulations, Allstate had no obligation to make any payments to either

Crosstown Medical or Ridgewood Labs for any PIP medical or diagnostic services they

allegedly provided to the Allstate Claimants.


**FIRST COUNT**
**(Objection to Discharge under Section 523(a)(2))**

212.     Plaintiffs repeat and reallege the statements and allegations contained in the

paragraphs above as if fully set forth herein.

213.     N.J.A.C.13:35-6.17(c)1 of the regulations of the Board of Medical Examiners

prohibits the giving or receiving of compensation for patient referrals and provides in pertinent

part:

> A licensee shall not, directly or indirectly, give to or receive from any licensed or
> unlicensed source a gift of more than nominal (negligible) value, or any fee,
> commission, rebate or bonus or other compensation however denominated,
> which a reasonable person would recognize as having been given or received in
> appreciation for or to promote conduct by a licensee including: purchasing a
> medical product, ordering or promoting the sale or lease of a device or appliance
> or other prescribed item, prescribing any type of item or product for patient use,
> or making or receiving a referral to or from another for professional services.

214.     N.J.A.C. 13:44E-2.6 of the regulations of the Board of Chiropractic Examiners

prohibits "a licensee to pay, offer to pay, or to receive from any person any fee or other form of

compensation for the referral of a patient."

215.     The New Jersey Commercial Bribery Statute, N.J.S.A. 2C:21-10 (a) 3 provides:

> a. A person commits a crime if he solicits, accepts or agrees to accept any
> benefit as consideration for knowingly violating or agreeing to violate a
> duty of fidelity to which he is subject as… (3)  A lawyer, physician,
> accountant, appraiser, or other professional adviser or informant.

Case 20-01004-VFP    Doc 1    Filed 01/03/20    Entered 01/03/20 17:28:51    Desc Main
                    Document      Page 51 of 62

216.    By accepting benefits as consideration for receiving patients from Angelo and others, Focazio violated a duty of fidelity to which he was subject as a physician, in violation of Section a 3 the Commercial Bribery Statute.

217.    The New Jersey Criminal Runner Statute, N.J.S.A. 2C:21-22.1 (b) provides that "A person is guilty of a crime of the third degree if that person knowingly acts as a runner or uses, solicits, directs, hires or employs another to act as a runner."

218.    N.J.S.A. 2C:21-22.1 (a) defines "Provider" and Runner to mean:

a. "Provider" means an attorney, a health care professional, an owner or operator of a health care practice or facility, any person who creates the impression that he or his practice or facility can provide legal or health care services, or any person employed or acting on behalf of any of the aforementioned persons.

"Runner" means a person who, for a pecuniary benefit, procures or attempts to procure a client, patient or customer at the direction of, request of or in cooperation with a provider whose purpose is to seek to obtain benefits under a contract of insurance or assert a claim against an insured or an insurance carrier for providing services to the client, patient or customer, or to obtain benefits under or assert a claim against a State or federal health care benefits program or prescription drug assistance program. "Runner" shall not include a person who procures or attempts to procure clients, patients or customers for a provider through public media or a person who refers clients, patients or customers to a provider as otherwise authorized by law.

219.    By receiving clients from Angelo and others, for pecuniary benefit in exchange for payment of compensation to Angelo and others, for the purpose of obtaining benefits under a contract of insurance or assert a claim against an insured or an insurance carrier for providing services to the client, Focazio violated section b of the Criminal Runner Statute, N.J.S.A. 2C:21-22.1.

220.        By participating in a scheme to be the nominal owner of Crosstown Medical and aiding, abetting or encouraging others with a concealed interest to operate Crosstown Medical, and participate in an illegal self-referral scheme between Crosstown Medical and Ridgewood Labs, Focazio violated New York and New Jersey laws prohibiting self-referrals and the Fraud Act.

221.        The New Jersey Medical Fee Schedule applicable to the payment of PIP medical services is based upon CPT-4 coding.  N.J.A.C. 11:3-29.2 specifically provides that "CPT" means the American Medical Association's Current Procedural Terminology, 4th Edition, coding system.  By submitting bills for PIP medical services by reference to CPT-4 codes, Focazio represented to Plaintiffs, among other things, that Allstate Claimants and others were provided with the medical services as described in the corresponding CPT-4 code, that the medical services were performed in a competent manner in accordance with all applicable statutes and administrative regulations, that the services were reasonable and medically necessary, and that the services and fees charged therefore were not excessive.

222.        A "person" or "practitioner" as defined in N.J.S.A. 17:33A-3 violates N.J.S.A. 17:33A-4(a) of the Fraud Act if he:

> a.        Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to, a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or
>
> b.        Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

      c.     Conceals or knowingly fails to disclose the occurrence of an event which affects a person□s initial or continued right or entitlement to (a) any insurance benefit or payment or (b) the amount of any benefit or payment to which the person is entitled.

223.     A "person" or "practitioner" as defined in N.J.S.A. 17:33A-3 violates N.J.S.A. 17:33A-4(b) of the Fraud Act, if he "knowingly assists, conspires with or urges any person or practitioner to violate any provisions of this act."

224.     A "person" or "practitioner" as defined in N.J.S.A. 17:33A-3 violates N.J.S.A. 17:33A-4(c) of the Fraud Act, if, "due to the assistance, conspiracy or urging of any person or practitioner, he knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act."

225.     Section 4(e) of the Fraud Act provides:

A person or practitioner violates this act if, for pecuniary gain, for himself or another, he directly or indirectly solicits any person or practitioner to engage, employ or retain either himself or any other person to manage, adjust or prosecute any claim or cause of action, against any person, for damages for negligence, or, for pecuniary gain, for himself or another, directly or indirectly solicits other persons to bring causes of action to recover damages for personal injuries or death, or for pecuniary gain, for himself or another, directly or indirectly solicits other persons to make a claim for personal injury protection benefits pursuant to P.L.1972, c.70 (C.39:6A-1 *et seq.*); provided, however, that this subsection shall not apply to any conduct otherwise permitted by law or by rule of the Supreme Court.

226.     Section 3 of the Fraud Act defines "pattern" to mean "five or more related violations" of N.J.S.A. 17:33A-1, *et seq.,* and further provides that "[v]iolations are related if they involve either the same victim, or same or similar actions on the part of the person or practitioner charged with violating [the Fraud Act]."

227.     Focazio assisted and/or conspired with Angelo and others by receiving patients from Angelo and others in exchange for kickbacks given directly or indirectly in the form of cash, "in kind" in the form of reciprocal referrals of patients, or some other type of compensation given by  Angelo or others to the Focazio Parties.

228.     Focazio also assisted and conspired with Angelo and others by leading certain of their clients, including certain of the Allstate Claimants, to believe they had valid bodily injury claims that would be enhanced by undergoing treatment at Focazio Parties, and others and thereby encouraging them to continue to undergo treatment regardless of whether it was medically necessary, and as a result of the assistance and urging of the Focazio Parties and others would receive additional revenue from Plaintiffs.  This additional revenue received from Plaintiffs was used in whole or in part by the Debtor, Focazio Parties and others to pay kickbacks.

229.     Focazio assisted and conspired with Zaitsev, Financial Vision Group and others by concealing their ownership of Crosstown Medical and by engaging in an illegal self-referral scheme whereby patients of Crosstown Medical, including the Allstate Claimants, were referred to Ridgewood Labs, an entity owned by Zaitsev and others, and to other entities that were part of an illegal patient referral network .

230.     Focazio engaged in the schemes as described herein that are/was designed, intended, and utilized for the purpose of misleading and defrauding Plaintiffs and other insurers into paying for healthcare services provided pursuant to an unlawful referral fee arrangement in violation of applicable regulations or statutes governing those services, including but not limited to N.J.S.A. 45:9-22.5, N.J.A.C. 13:35-6.17(b), New York Public Health Law 238-A, N.J.A.C.

13:35-6.17(c)1, N.J.A.C. 13:44E-2.6 and N.J.A.C. 11:3-29.2, and in violation of criminal laws,

including but not limited to N.J.S.A. 2C:21-10 (a) 3, and N.J.S.A. 2C:21-22.1 (b).

231.     Focazio through his participation directly or indirectly in the schemes described

above as well as other schemes, knowingly assisted, conspired with or urged Angelo, Zaitsev

and others to violate provisions of the Fraud Act as described herein, and thereby Focazio

violated Section 4(b) of the Fraud Act.

232.     Due to the assistance, conspiracy or urging of the Focazio Parties, Angelo,

Zaitsev and members of the Financial Vision Group, and others, Focazio knowingly benefited,

directly or indirectly, from the proceeds derived from the violations of the Fraud Act as

described herein, and therefore the Focazio Parties violated Section 4(c) of the Fraud Act.

233.     Foczio's participation in the illegal self-referral scheme including the referral of

patients from Crosstown Medical to Ridgewood Labs and other health care providers in their

network, and concealing the absolute ownership and control of Crosstown Medical by Zaitsev

and the members of  Financial Vision Group, also violated Section 4(c) of the Fraud Act.

234.     Each and every solicitation by, between and/or among Focazio, the Focazio

Parties, Angelo, Zaitsev, Crosstown Medical, Ridgewood Labs  and others, for the referral of

any patient, including the Allstate Claimants, in exchange for kickbacks or otherwise in

furtherance of the referral schemes as described herein, Focazio violated Section 4(e) of the

Fraud Act.

235.     Plaintiffs have to date paid substantial sums, directly or indirectly, to the Focazio

Parties, Crosstown Medical, Ridgewood Labs  and others for PIP medical expense benefits

based upon the bills, HICFs, referral forms, assignments, medical records and reports that were

submitted by the Focazio Parties.  In addition, Plaintiffs have incurred and will continue to incur

substantial costs of investigation, costs of suit and attorneys' fees in connection with the

numerous violations of the Fraud Act.

236.        As a result of their violations of the Fraud Act as described herein, Focazio, is

liable to Plaintiffs for compensatory damages under the Fraud Act.

Through the repeated violations of the Fraud Act as described herein, Focazio engaged in a

"pattern" of violating the Fraud Act and as a result of which Focazio is liable to Plaintiffs for

treble damages pursuant to Section 7(b) of the Fraud Act.

237.        Accordingly, Fraud Act is liable to Plaintiffs for damages caused by his

wrongdoing.

238.        Such damages are non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

*The Racketeer Influenced and Corrupt Organizations Act*

239   .        The Racketeer Influenced and Corrupt Organizations Act ("RICO" or the "Act"),

18 U.S.C.A. sec. 1962(c) states:

> It shall be unlawful for any person employed by or associated with any enterprise
> engaged in, or the activities of which affect, interstate commerce, to conduct or
> participate, directly or indirectly, in the conduct of such enterprise's affairs
> through a pattern of racketeering activity or collection of unlawful debt.

240.        RICO defines an "enterprise", as including "any individual, partnership,

corporation, association, or other legal entity, and any union or group of individuals associated

in fact although not a legal entity". See 18 U.S.C.A. sec. 1961 (4).

241.        In defining "racketeering activity", the Act enumerates the crimes upon which a

RICO violation may be predicated. The list of predicate crimes includes mail fraud, 18 U.S.C.A.

sec. 1341; wire fraud, 18 U.S.C.A. sec. 1343;  and a crime, such as bribery, that "is chargeable

under State law and punishable by imprisonment by more than one year."  Commercial bribery

in New York, in violation of New York Penal Law § 180.03, is a crime punishable by more than

one year.

242.   18 U.S.C.A. sec. 1964(c) states:

> Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in the appropriate United States District Court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee....

*The Enterprise*

243.     At all relevant times, the Plaintiffs are "persons" within the meaning of the Act.

See 18 U.S.C.A. sec. 1961 (3).

244.     At all relevant times, the Defendants are "persons" within the meaning of the

Act. See 18 U.S.C.A. sec. 1961 (3).

245.     Focazio, Crosstown Medical, Financial Vision Group, Zaitsev, Kandhorov,

Interstate, Abrams Fensterman, Ridgewood Labs, John Doe 1-50, John Roe 1-50, ABC Corp. 1-

50 and XYZ, P.C. are a group of individuals and companies associated in fact (collectively

referred to herein as the "Enterprise"), that engaged in, and the activities of which affected,

interstate commerce.

246.     The participants and associates of the Enterprise have been associated for a

substantial period of time, have functioned as a continuing unit, and have been joined in a

common purpose. The Enterprise has an identifiable structure, with each member fulfilling a

specific role to carry out and facilitate its purpose, as set forth herein.

247.     The development and execution of the activities of these individuals and entities

in furtherance of the purpose of the Enterprise would exceed the capabilities of each member of

the Enterprise acting singly or without the aid of each other.

248.       Because Focazio is an owner of Crosstown Medical on paper only, and because

Crosstown Medical has at all times been owned and controlled by non-licensees in violation the

laws and regulations of the State of New York, each invoice submitted to the Plaintiffs by the

Enterprise in the name of Crosstown Medical constituted a separate violation of the mail fraud

act, 18 U.S.C.A. sec. 1341 and/or wire fraud act, 18 U.S.C.A. sec. 1343, and therefore violated

the RICO Act, 18 U.S.C.A. sec. 1962(c).

249.       The payments to Focazio and Crosstown Medical by Interstate and Financial

Vision Group, in exchange for Focazio's participation in the scheme and for allowing

Crosstown Medical to be used unlawfully by non-licensees to profit from healthcare services

and to make referrals to Ridgewood Labs and other health care entities in which members of the

Enterprise had financial interest, constituted commercial bribes within the meaning of New

York Penal Law § 180.03, and therefore violated the RICO Act, 18 U.S.C.A. sec. 1962(c).

250.       Each and every invoice submitted to the Plaintiffs by the Enterprise in the name

of Ridgewood Labs in connection with laboratory services rendered to a Crosstown Medical

patient, were the result of referrals made in violation of the applicable self-referral prohibitions

under New York and New Jersey law, and constituted a separate violations of the mail fraud act,

18 U.S.C.A. sec. 1341 and/or wire fraud act, 18 U.S.C.A. sec. 1343, and therefore violated the

RICO Act, 18 U.S.C.A. sec. 1962(c).

**WHEREFORE**, Plaintiffs demand judgment against William Focazio as follows: (i)

determining that all debts owed by William Focazio to Plaintiffs are nondischargeable; (ii)

awarding the Plaintiffs' reasonable attorneys' fees and costs incurred in this action; and (iii)

granting Plaintiffs such other relief as this Court deems just and equitable.

## SECOND COUNT
### (Objection to Discharge under Section 523(a)(6))

251.        Plaintiffs repeat and reallege the statements and allegations contained in the

proceeding paragraphs as if fully set forth herein.

252.        Focazio's actions set forth above were intentional and deliberate and had a

purpose of producing injury or have a substantial certainty of producing injury to Plaintiffs.

253.        Focazio intentionally paid or received kickbacks from or to other parties with the

full knowledge that the receipt or payment of the transactions were illegal and would damage

Plaintiffs.

254.        Such damages are non-dischargeable pursuant to 11 U.S.C. § 523(a)(6).

**WHEREFORE**, Plaintiffs demand judgment against William Focazio as follows: (i)

determining that all debts owed by William Focazio to Plaintiffs are nondischargeable; (ii)

awarding the Plaintiffs' reasonable attorneys' fees and costs incurred in this action; and (iii)

granting Plaintiffs such other relief as this Court deems just and equitable.

## THIRD COUNT
### (Objection to Discharge under Section 727(a)(3))

255.        Plaintiffs repeat and reallege the statements and allegations contained in

preceding paragraphs as if fully set forth herein.

256.        In engaging in the acts set forth above, the Debtor has concealed, destroyed,

mutilated, falsified, or failed to keep or preserve any recorded information, including books,

documents, records and papers, from which the Debtor's financial condition or business

transactions might be ascertained, and such act or failure to act was not justified under the

circumstances of this case.

257.        As a result, Focazio should be denied a discharge pursuant to Section 727(a)(3)

of the Bankruptcy Code.

**WHEREFORE**, Plaintiffs demand judgment against William Focazio as follows: (i)

determining that all debts are nondischargeable; (ii) awarding the Plaintiffs' reasonable

attorneys' fees and costs incurred in this action; and (iii) granting Plaintiffs such other relief as

this Court deems just and equitable.


## FOURTH COUNT
### (Objection to Discharge under Section 727(a)(4)(A))

258.        Plaintiffs repeat and reallege the statements and allegations contained in

preceding paragraphs as if fully set forth herein.


259.        In engaging in the acts set forth above, and failing to disclose substantial

interests and assets of the estate, Focazio knowingly and fraudulently, in or in connection with

the case, made a false oath or account.

260.        As a result, Focazio should be denied a discharge pursuant to Section

727(a)(4)(A) of the Bankruptcy Code.

**WHEREFORE**, Plaintiffs demand judgment against William Focazio as follows: (i)

determining that all debts are nondischargeable; (ii) awarding the Plaintiffs' reasonable

attorneys' fees and costs incurred in this action; and (iii) granting Plaintiffs such other relief as

this Court deems just and equitable.

## FIFTH COUNT
### (Objection to Discharge under Section 727(a)(4)(D))

261.        Plaintiffs repeat and reallege the statements and allegations contained in preceding paragraphs as if fully set forth herein.

262.        In engaging in the acts set forth above, and failing to disclose substantial interests and assets of the estate, Focazio knowingly and fraudulently, in or in connection with the case, withheld from the Chapter 11 Trustee, an officer of the estate entitled to possession under title 11, recorded information relating to the Debtor's property or financial affairs, including, but not limited to, documents, records, and papers.

263.        As a result, Focazio should be denied a discharge pursuant to Section 727(a)(4)(D) of the Bankruptcy Code.

        **WHEREFORE**, Plaintiffs demand judgment against William Focazio as follows: (i) determining that all debts are nondischargeable; (ii) awarding the Plaintiffs' reasonable attorneys' fees and costs incurred in this action; and (iii) granting Plaintiffs such other relief as this Court deems just and equitable.

## SIXTH COUNT
### (Attorney's Fees- Rule 7008(b))

264.        Plaintiffs repeat and reallege the statements and allegations contained in the preceding paragraphs as if fully set forth herein.

265.  Plaintiffs have incurred, and will continue to incur, substantial legal fees and costs in prosecution of this action.

266.  Plaintiffs are entitled to legal fees pursuant to Federal Rule of Bankruptcy Procedure 7008(b).

**WHEREFORE**, Plaintiffs demand judgment against William Focazio as follows: (i)

awarding the Plaintiffs' reasonable attorneys' fees and costs incurred in this action; and (ii)

granting Plaintiffs such other relief as this Court deems just and equitable.


**GIORDANO, HALLERAN & CIESLA, P.C.**
*Attorneys for Plaintiffs*

By: */s/  Donald F. Campbell, Jr.*
     Donald F. Campbell, Jr. Esq.


DATED: January 3, 2020